UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE OKONITE COMPANY,<br>Plaintiff,<br><br>v.<br><br>INT'L BROTHERHOOD OF<br>ELECTRICAL WORKERS, LOCAL<br>1196,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:21-cv-00044-MSM |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The Okonite Company ("Okonite") is a manufacturer of industrial cables whose production and maintenance employees are covered by a Collective Bargaining Agreement ("Agreement") (ECF 8-1) entered into with Local 1196 of the International Brotherhood of Electrical Workers ("the Union"). A dispute arose between the parties concerning a clause in the Agreement that governs the interaction between vacation days that employees discharge as part of their benefits and leave taken under the Family Medical Leave Act ("FMLA") ("family leave").

The matter was referred to arbitration. Okonite challenges whether the issue is arbitrable, and before reaching the merits of the dispute, the Court will address

1

that contention. The parties filed cross-Motions for Summary Judgment and have agreed that the Court's resolution of those Motions will resolve this civil action. (ECF Nos. 17, 19). When assessing such cross Motions, the Court considers each Motion separately according to established standards. *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund*, 736 F.3d 33, 36 (1st Cir. 2013).

## I. JURISDICTION

The Complaint arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq* which provide federal question jurisdiction. 28 U.S.C. § 1331.

## II. THE DISPUTE

Employees at Okonite enjoy as one of their benefits two, three, four or five weeks of paid vacation per calendar year, depending on their length of service. (ECF No. 8-1 at 17-18.) There is no provision for carrying-forward unused vacation days into the next calendar year. *Id.* The disputed provision is Article VII § 6(E) which reads as follows:

> The employee shall use vacation time for any absence, partial absence, or leave of absence covered by the Family and Medical Leave Act (FMLA) and/or Rhode Island Parental and Family Medical Leave Act, beginning on the first day of the absence/leave and continuing for the duration of the leave, *except that employees shall be guaranteed at least one week (5 work days) of their vacation time off.*

(emphasis added). The parties agree that the vacation/leave provision was the subject of specific negotiation, but they disagree about its practical effect. Okonite maintains that the "except that . . . off" clause means that an employee who takes a

family leave is guaranteed to have at least five days in that same calendar year *not* sacrificed to the family leave: in other words, regardless of the amount of family leave taken and the amount of total vacation time that employee accrues during the year, the employee is entitled to have at least five days available for "pure vacation." The Union agrees that the five days "pure vacation" is an entitlement, but it maintains that the guarantee applies to the time *after* the family leave is completed and before the end of the calendar year. It insists that even if the employee has used five days of "pure vacation" time before taking family leave, s/he is entitled to reserve *another* five such days after the leave is completed; Okonite, on the other hand, insists that if the employee had already discharged five such days *before* the family leave began, s/he has exhausted the entitlement and must discharge the remainder of allotted vacation time against the family leave. Okonite's interpretation results in more on-site work time during the calendar year for employees taking family leave than does the Union's interpretation.

      The practical effect of the difference in interpretation is understood best with an example. Assume employee Patty Smith accrues fifteen vacation days per year. She takes a vacation in the first week of February, discharging five vacation days. She then takes four weeks of family leave in June. Okonite contends she would be required to exhaust her total ten remaining vacation days as family leave days (going without pay for the remaining two weeks of the leave). Between January 1 and December 31, Patty would be off-site on vacation for one week in February, and four weeks on family leave in June, thus working on-site for forty-seven weeks of the year.

Under the Union's interpretation, when she starts her family leave, Patty would be entitled to reserve five of her remaining ten days for "pure vacation," and would therefore discharge only five days toward the leave; she would emerge from the leave still retaining five days for "pure vacation." Although Patty would be unpaid for three weeks of her four-week family leave, she would end up working on-site only forty-six weeks of the year.

### III.     ARBITRATION

The arbitrator, on October 22, 2020, issued a confusing opinion that appeared to make no internal sense. The arbitrator declared that "[t]here is no evidence presented at the hearing or in the documents to support [the Union's] interpretation." There was "no logic" to the view – espoused by the Union – that an employee who had already taken a vacation prior to the leave (as Patty did in the example above) would retain additional time for use as vacation at the end of the leave. However, having made that declaration, the arbitrator nonetheless concluded that an employee who took family leave would be entitled to "retain up to five days of paid vacation" out of whatever unused vacation that employee had to her credit at the start of the leave. (ECF No. 8-2, at 5.) That conclusion embodied the Union's interpretation and would allow hypothetical Patty to reserve five days for vacation after her leave ended, even though she had already taken five days' vacation in February.

Perhaps because of what seems an internal inconsistency, both parties requested clarification. On October 23, 2020, the arbitrator released an Addendum in which he "[found] merit to the grievance." (ECF No. 8-3 at 4.) In much clearer

4

language than the original Opinion, he held "that if an employee has up to five days of scheduled approved vacation eligibility at the time he or she commences an absence provided for in the Leave Acts these vacation days shall be retained, regardless of prior vacation taken." *Id.*  In no uncertain terms, he wrote, "the Union's interpretation of Article VII, Section 6E was the correct one." *Id.*

## IV.   ARBITRABLE DISPUTE

Okonite claims the issue here was not arbitrable because no employee had at any time been affected, adversely or otherwise, by the policy.  The Union claims Okonite waived that objection by submitting to arbitration.  Okonite responds that it reserved its objection by voicing it several times, even while participating in the arbitration.

Whether Okonite reserved or waived its objection need not be addressed, because the issue was in any event arbitrable.  The terms of the Agreement define as a grievance "a misunderstanding, complaint, interpretation or violation of specific terms of the contract." (ECF No. 8-1 at 8.)  Any grievance, if not satisfactorily settled, "shall be submitted to arbitration.  *Id.* at § 3.  What is at issue here is clearly an "interpretation" of a contract clause.  Around August 2019, Okonite posted a notice to its employees, entitled "Vacation Time Reminder," which outlined how it planned to implement the provision.  (ECF No. 21-1 at 3, Declaration of Gerald M. Peloquin). It warned that any vacation time taken prior to the leave "will come off of the 5 day guarantee." *Id.* at 4.  Okonite insists that its posted notice was not an "interpretation," but instead was simply an "intent to interpret" which would not

5

constitute a "grievance" and therefore not be arbitrable. That is disingenuous. An "intent to interpret" might be an advance advisory to employees or the Union that Okonite would at some time in the future publish its understanding of the policy: but when it posted how it planned to implement the policy, that was an "interpretation" not merely notice of a future intent.

When an Agreement contains, as this one does, an arbitration clause, there is a presumption that disputed issues go to arbitration. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). Doubts are resolved in favor of arbitrability, and disputes are excluded from arbitration only by clear and express provisions. *Id.* at 583. Here, what is disputed is Okonite's "interpretation" of a provision in the Agreement and that is clearly defined by the document itself as a "grievance" subject to arbitration. Thus, regardless of the arbitrator's characterization of his opinion as "advisory," the Agreement does not require that any employee be affected for the Union to press a grievance, therefore the arbitration of this dispute was appropriate.

## V.  REVIEW OF THE ARBITRATOR'S DECISION

This Court's role in reviewing an arbitration award is a limited one. *AT&T Technologies v. Communs. Workers of Am.*, 475 U.S. 643, 649-50 (1986). A court may decide whether a party is bound by an arbitration and what issues may go to arbitration, but it may not decide the merits of the dispute. *Id.* The judicial review of an arbitration award is "among the narrowest known in law." *Northern New*

6

*England Telephone Operations, LLC v. Local 2327, IBEW*, 735 F.3d 15, 21 (1st Cir. 2013).

The United States Supreme Court could not have made clearer how narrow the review is:

> We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (quoting *United Paperworkers Intern'l Union, AFL-CIO v. ] Misco*, [484 U.S. 29] at 38, 108 S.Ct. 364 [(1987)]. It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, factfinding" does not provide a basis for a reviewing court to refuse to enforce the award. *Misco*, 484 U.S. 29 at 39, 108 S.Ct. 364.

*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001). The First Circuit has used various descriptive phrases to emphasize the limits of judicial review of arbitration awards: *Keebler Co. v. Truck Drivers, Local 170*, 247 F.3d 8, 10 (1st Cir. 2001) ("extremely narrow and exceedingly deferential"); Northern New England Telephone Operations, LLC, 735 F.3d at 20-21 ("among the narrowest known in law"); *Steward Holy Family Hosp., Inc. v. Mass. Nurses Ass'n*, 932 F.3d 14, 17 (1st Cir. 2019) (entitled to "extreme" deference).

The FAA cites four grounds for vacating an arbitration award.[1]  Courts including the First Circuit have interpreted the fourth – that the arbitrator exceeded his or her powers or "imperfectly executed them" in a major way – to mean that the arbitrator ignored the plain language of the Agreement or knowingly disregarded applicable law.  *Prospect E. Holdings, Inc. v. United Nurses & Allied Professionals, Inc.*, No. 18-671-JJM-PAS, 2019 WL 2929707 at *3 (D.R.I. July 8, 2019); *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997).  Another way of phrasing a similar sentiment is, as the First Circuit has said, the award should be upheld unless it is "fundamentally unfair."  *Keebler*, 247 F.3d at 11.

Arbitrators are not required to state reasons for their awards, *Keebler*, 247 F.3d at 12, and courts do not sit in review of the intellectual process employed by the arbitrator to reach a decision.  Instead, judicial review is limited to the question of whether the arbitrator's decision – in this case the interpretation of the vacation/leave clause – is "to any extent plausible."  *Keebler,* 247 F.3d at 10.  *Accord Salem Hosp. v. Mass. Nurses Ass'n,* 449 F.3d 234, 239 (1st Cir. 2006) (arbitrator's conclusion that last sentence of provision was ambiguous was not plausible).  In addition, a court can uphold an award on reasons different from those employed by the arbitrator.  *Labor Relations Div. of Construction Indus. v. Intern'l Bhd. of Teamsters, Local #379*, 29 F.3d 742, 747 (1st Cir. 1994).  Thus, the apparent

---

[1] The first three are inapplicable here: that the award is the product of fraud or corruption, that the arbitrator was partial or corrupt, that misconduct occurred in refusing to postpone the hearing or refusing to hear evidence.  9 U.S.C. § 10(a).

8

inconsistency in the first decision alluded to above is not of concern: the operative question is whether the bottom-line resulting interpretation was plausible.

It is not possible here to say that the arbitrator's decision was "implausible." It does result in disparate outcomes depending on whether an employee has taken vacation before taking family leave. Those who have essentially "get" two weeks of "pure vacation," while those who have not are limited to one. But this was a negotiated provision, and it would not have been unreasonable to take the need for family leave into consideration when framing rules about discharging vacation time. Further, the fact that the policy has not been applied adversely to anyone since its adoption speaks to a low potential for unfairness.

For these reasons, the Court GRANTS the Union's Motion for Summary Judgment (ECF No. 19) and DENIES Okonite's Motion for Summary Judgment (ECF No. 17).

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

Date: November 22, 2021